## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| JOSEPH I. YODER, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | Case No. 1:21-cv-288 |
| | ) | |
| v. | ) | |
| | ) | |
| SUGAR GROVE AREA SEWER | ) | |
| AUTHORITY, | ) | |
| | ) | |
| Defendant. | ) | |

### MEMORANDUM OPINION

**Susan Paradise Baxter, United States District Judge**

This civil litigation concerns a longstanding dispute between certain members of the Old Order Amish religion and Sugar Grove Area Sewer Authority ("SGASA" or the "Authority") over the enforcement of Sugar Grove Township Ordinance No. 04-06-15, entitled "Sewage Connection Ordinance."  ECF No. 1-4.  Plaintiffs are Joseph I. Yoder and his wife Barbara L. Yoder (the "Yoders"), along with the Yoder Family Trust No. 2, Hardwood Mill Trust, and Stateline View Trust (the "Trusts").  Together with the Trusts, the Yoders own real property located at 738 Catlin Hill Road in Sugar Grove, Pennsylvania.  The Yoder Family Trust No. 2 and the Hardwood Mill Trust own the portion of the real estate where the Yoders reside.  The Yoders serve as trustees for each of the three Trusts.  Plaintiffs commenced this civil action to enjoin SGASA's enforcement of the Sewage Connection Ordinance (hereafter, the "Ordinance"), which they claim violates the Yoders' religious beliefs.[1]

---

[1] Although the Trusts are included as Plaintiffs in this case, the Yoders are the real parties in interest because they reside on the property in question, they are partial owners of it, their religious views form the basis of this lawsuit, and they serve as trustees of the various Trusts. *See* ECF No. 1, ¶¶3-5; *see also* Fed. R. Civ. P. 17(a)(1)(E) (allowing trustees to file suit in their own names); *accord QRK, LLC v. Kenilworth Ct. Residents Ass'n, Inc.*, No. 592 C.D. 2016, 2017

Pending before the Court is SGASA's motion to dismiss the complaint on various grounds.  Because this civil action is barred by principles of claim preclusion and issue preclusion, SGASA's motion will be granted on that basis.

## I.   FACTUAL AND PROCEDURAL BACKGROUND[2]

### A.   Factual Background

The Yoders are members of the Old Order Amish, a religion that embraces a simple lifestyle and rejects modern conveniences and technology such as indoor plumbing and electricity.  Compl. ¶¶ 1, 11, 28-29.  In accordance with these religious tenets, the Old Order

---

WL 1400048, at *4 (Pa. Commw. Ct. Apr. 19, 2017) (noting that, under the "generally accepted definition," the real party in interest "is the person who has the power to discharge the claim upon which suit is brought and to control the prosecution of the action brought to enforce rights arising under the claims") (internal quotation marks and citation omitted).  By contrast, it appears that the Trusts were named as Plaintiffs based solely on their status as partial owners of the property where the Yoders reside, which is subject to the provisions of the Sewer Connection Ordinance.  It is therefore questionable whether the Trusts have standing to assert the religious-based claims in this case.  For all of these reasons, the Court's reference to the "Plaintiffs' in this case primarily concerns the Yoders.

[2]   The following background facts are derived from the complaint, the exhibits to the complaint, and matters of public record, which can be judicially noticed for purposes of adjudicating a motion under Federal Rule of Civil procedure 12(b)(6). *See Pension Ben. Guar. Corp. v. White Consol. Indus., Inc.,* 998 F.2d 1192, 1196 (3d Cir. 1993) ("To decide a motion to dismiss, courts generally consider only the allegations contained in the complaint, exhibits attached to the complaint and matters of public record.") (citing authority).

When reviewing a Rule 12(b)(6) motion, the court must "'accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief.'" *Eid v. Thompson*, 740 F.3d 118, 122 (3d Cir. 2014) (quoting *Phillips v. County of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008)). To survive a Rule 12(b)(6) challenge, the plaintiff's "'[f]actual allegations must be enough to raise a right to relief above the speculative level....'" *Id.* (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (ellipsis in the original)). "Thus, 'only a complaint that states a plausible claim for relief survives a motion to dismiss.'" *Id.* (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009)).

Amish utilize an outhouse, or outdoor privy, for the elimination of human waste -- or what is sometimes referred to as "blackwater." *Id.* ¶29.

Defendant SGASA is an agency of Sugar Grove Township, located in Warren County, Pennsylvania. Compl. ¶7.  SGASA has undertaken a project with the stated goal of providing sanitary sewage services through the construction of a municipal sewer system in the Area of Sugar Grove, including the area along Catlin Hill Road.  *Id.* ¶13.  To that end, the Township passed a "Sewage Connection Ordinance," known as Ordinance Number 04-06-15, which provides (in relevant part) as follows:

> **SECTION 1**.
>
> Every owner of property in the Municipality whose property abuts upon any sewer system now or hereafter constructed by the Authority or any other municipal authority shall connect, at the Owner's own cost, any house, building or other structures located on said property and occupied or intended for human occupancy having sewage produced thereon or emanating therefrom with such public sanitary sewer for the purpose of disposing all acceptable sanitary sewage discharged or produced from said property.  . . .
>
> **SECTION 2**.
>
> After completion of construction of said Sewer System it shall be unlawful for any owner, lessee or occupier of any property in the Municipality abutting upon any public sanitary sewer to employ any means, including septic tank, cesspool, privy vault, mine hole or other system, for the disposal and treatment of acceptable sanitary sewage other than to discharge the same into and through said public sanitary sewers.

ECF No. 1-4 at 1-2.

Citing the Ordinance, SGASA informed Plaintiffs and others within its jurisdiction that each homeowner is required to connect to the municipal sewer system.  Compl. ¶14.  Connection to the sewer system involves the installation of a grinder pump, which depends upon electricity and running water for its operation.  *Id.* ¶¶15-16.  Homeowners who do not connect to the sewer system incur service fees, penalties, and fines.  *Id.* ¶17.

The Yoders believe that their method of disposing of waste-water is sufficient for their family's needs and does not present a health or safety threat to themselves, their neighbors, or the public at large.  Compl. ¶32. They view any mandatory connection to a municipal sewer system as a violation of their religious beliefs, which generally oppose connection to the greater world and its technology.  *Id*. ¶¶ 30, 34-38.  The Yoders also believe that their religion requires them to remove human waste through their own toil.  *Id*. ¶¶ 31, 36.

### B.  Prior Litigation

The efforts of SGASA to ensure Yoders' compliance with the Ordinance, and the Yoders' resistance to those efforts, have culminated in a number of legal proceedings dating back more than ten years.  In 2010 and 2012, respectively, SGASA filed a municipal claim against the Yoders, as well as a private criminal complaint, based on the Yoders' failure to pay overdue monthly sewer charges.  *See Yoder v. Sugar Grove Area Sewer Auth*., No. 1927 C.D. 2016, 2018 WL 297002, at *1 n.2 (Pa. Commw. Ct. Jan. 5, 2018) (citing litigation filed in the Warren County Court of Common Pleas at Docket No. MLD 71 of 2010 and Docket Nos. SA 21 and 22 of 2012); *Commonwealth v. Yoder*, Nos. 229 C.D.2012, 230 C.D. 2012, 2013 WL 3942094 (Pa. Commw. Ct. Jan. 4, 2013) (affirming the Yoders' judgments of sentence); *see also* ECF No. 1-3 (Memorandum Opinion issued in *Sugar Grove Area Sewer Authority v. Yoder*, MLD 71 of 2010 and ED 27 of 2020 (Warren County Ct. Comm. Pleas May 19, 2021) (granting petition to set aside Sheriff's Sale following writ of execution on municipal claim)).

More relevant for present purposes are three state court proceedings, also emanating from the Warren County Court of Common Pleas, and summarized by the Pennsylvania Commonwealth Court as follows:

First, in prior litigation, the Authority sought injunctive and declaratory relief to compel Owners[3] to connect to its system as mandated by the Mandatory Connection Ordinance (suit docketed at No. 191 of 2012). The Authority also requested that Owners be removed from the property to enable the Authority to connect the property in a manner it deemed fit (Prior Authority Litigation).

The Authority filed a motion for judgment on the pleadings. After briefing and argument, the trial court granted the Authority's motion in part, mandating Owners' connection to the sewer system. However, the trial court denied the Authority's request to compel Owners to allow connection in a manner the Authority deemed fit. Tr. Ct. Order, 11/26/13 (2013 Order). Relevant here, paragraph 5 of the 2013 Order provided: "[The Authority] shall, in the process of connecting the property to the sewer system, take due care as to [Owners'] religious convictions, and shall proceed in a manner so as to pose the least possible intrusion on [Owners'] religious convictions and beliefs." *Id*. (emphasis added).

Second, while the Prior Authority Litigation was pending, the Old Order Amish, including Owners, brought a class action suit against the Authority challenging the constitutionality of the Mandatory Connection Ordinance (suit docketed at No. 304 of 2013). Specifically, the class sought a declaration that the Mandatory Connection Ordinance violated their rights to religious freedom under the Act[4] and the Constitution, and it sought an injunction against mandatory connection. Ultimately, President Judge Maureen Skerda resolved the merits of the class action suit against the Old Order Amish on January 27, 2016. This Court quashed the appeal (appeal docketed in this Court at 346 C.D. 2016), for failure to file post-trial motions. The Supreme Court then denied the petition for allowance of appeal on November 22, 2016, (Pa., No. 284 WAL 2016).

Third, the current litigation, an action for injunctive relief, stems from disagreements regarding the means of connecting Owners to the sewer system. Initially, the Authority advised Owners by letter that they must open an electric service account with Penelec to power the grinder pump for their connection. In response, Owners filed the preliminary injunction petition (Petition) underlying the instant appeal (Petition docketed at No. 507 A.D. of 2014). In their Petition, Owners claimed that requiring them to use electric service for the grinder pump, and open a Penelec account for that purpose, violated their rights to religious freedom guaranteed by the First Amendment to the U.S. Constitution, and Article 1, Section 3 of the Pennsylvania Constitution, and protected by the Act.

---

[3] The term "Owners" in the court's opinion refers to the Yoders, both individually and as Trustees of the Yoder Family Trust No. 2 and Hardwood Mill Trust. *See Yoder v. Sugar Grove Area Sewer Auth*., 2018 WL 297002, at *1.

[4] The term "Act" in the court's opinion refers to Pennsylvania's Religious Freedom Protection Act, codified at 71 P.S. §§ 2401–2407. *See Yoder v. Sugar Grove Area Sewer Auth*., 2018 WL 297002, at *1 n.1.

*Yoder v. Sugar Grove Area Sewer Auth.*, 2018 WL 297002, at *1-2 (internal footnotes added; remaining alterations in the original).

In Case No. 507 of 2014, the state trial court held a two-day hearing on the Yoders' preliminary injunction motion, after which it issued an order (the "2015 Order") denying relief. *See* ECF No. 7-8. The trial court did not compel the Yoders to open their own account with Penelec (or any other electricity provider), but it ruled that SGASA could connect the Yoders' premises to the public sewer system "in a manner that shall be at [SGASA's] sole discretion and at the [Yoders'] sole expense." *Id.*

On appeal, the Pennsylvania Commonwealth Court ruled that the "sole discretion" language in the trial court's 2015 Order constituted an improper amendment of Paragraph 5 of the 2013 Order, which had required the Authority to be mindful of the Yoders' religion, including its prohibition of the use of electricity, and implement the connection using the means least intrusive to the Yoders' religious beliefs. *See Yoder v. Sugar Grove Area Sewer Auth.*, No. 1956 C.D. 2015, 2016 WL 3127351 (Pa. Commw. Ct. June 3, 2016); *Yoder v. Sugar Grove Area Sewer Auth.*, 2018 WL 297002, at *2 (explaining the procedural history of the case). The Commonwealth Court therefore reinstated the trial court's original mandate in the 2013 Order that the Authority employ the least intrusive means of connection, accounting for the Yoders' religious beliefs. *Id.* The court then remanded the case with the directive that the trial court discern whether the use of electricity was the least intrusive means of implementing the required sewer connection. *Yoder v. Sugar Grove Area Sewer Auth.*, 2018 WL 297002, at *5. The court further "instructed the trial court to analyze all six elements of preliminary injunctive relief, utilizing the use of electricity as the harm to be enjoined." *Id.*

On remand, the state trial court again denied the Yoders' request for a preliminary injunction, finding that they failed to satisfy their evidentiary burden with respect to three of the six essential prerequisites -- specifically, factors two, four, and six.  ECF No. 7-10.[5]  As to the second factor, the trial court found that enjoining the use of electricity to power the Yoders' connection to the sewer system would cause more harm than denying their request for an exemption.  *See* ECF No. 7-10 at 4-6.  Forcing the Yoders to take action in violation of their religious beliefs would result in moderate harm, the court found.  *Id*. at 4.  It assessed the harm as "moderate" based on evidence that the Yoders sometimes used electricity out of necessity; also, the installation of an electric-powered grinder pump would constitute only an "indirect" use of electricity, because the grinder pump is an underground device that the Yoders would never see or touch.  *Id*.  As a related finding, the trial court determined that there was no acceptable alternative source to power the grinder pump, which was a critical component for sewer connection:  the use of a gravity system was untenable due to the location of the subject property; the Authority's engineer had been unable to find a non-electric grinder pump from any

---

[5] As recited by the trial court,

> The six essential prerequisites that a moving party must demonstrate to obtain a preliminary injunction are as follows: *(1) the injunction is necessary to prevent immediate and irreparable harm that cannot be compensated adequately by damages; (2) greater injury would result from refusing the injunction than from granting it, and, concomitantly, the issuance of an injunction will not substantially harm other interested parties in the proceedings; (3) the preliminary injunction will properly restore the parties to their status as it existed immediately prior to the alleged wrongful conduct; (4) the party seeking injunctive relief has a clear right to relief and is likely to prevail on the merits; (5) the injunction is reasonably suited to abate the offending activity; and, (6) the preliminary injunction will not adversely affect the public interest. . . .*

ECF No. 7-10 at 3 (quoting *SEIU Healthcare Pennsylvania v. Com*., 104 A.3d 495, 501–02 (Pa. 2014)) (emphasis added by the trial court).

supplier; and it was not feasible for the Authority to create a custom prototype grinder pump that might run on an alternative power source.  *Id.* at 4-5.

The trial court next determined that granting the plaintiffs' request for a preliminary injunction would result in "substantial" harm "due to the serious threat to the public's health and safety."  ECF No. 7-10 at 5.  In so concluding, the trial court pointed to evidence that the soil in Northwest Pennsylvania is unsuitable for sewage disposal.  *Id.* at 5-6.  The court credited testimony that there is a high failure rate of the existing on-lot sewage systems in the area, and that avoiding such malfunctions is important for health and safety. *Id.* at 6.  The court specifically noted that when sewage leaks occur, there is a potential for health problems to spread through people or animals that come into contact with the sewage and then spread it to new locations through their movement.  *Id.*  "Furthermore," the court found, "the soil in the area has a high perk content, resulting in groundwater, which would allow untreated waste to move laterally and potentially into someone's water source."  *Id.*  In sum, the trial court determined that the second "essential prerequisite" for preliminary injunctive relief was not satisfied, because the plaintiffs had not demonstrated that "greater injury would result from refusing the injunction than from granting it, and, concomitantly, the issuance of an injunction will not substantially harm other interested parties in the proceedings."  *See* ECF No. 7-10 at 3 (quoting *SEIU Healthcare Pennsylvania v. Com.*, 104 A.3d 495, 501–02 (Pa. 2014)).

As to the fourth factor, the trial court found that the Yoders had failed to demonstrate a clear right to relief.  Instead, the Yoders merely argued that they should not have to connect to the public sewer system; however, their obligation to connect had already been established in Case No. 191 of 2012.[6]  The question before the court in Case No. 507 of 2014 was whether a

---

[6] *See Yoder v. Sugar Grove Area Sewer Auth.*, No. 1956 C.D. 2015, 2016 WL 3127351, at *8 (Pa. Commw. Ct. June 3, 2016) (noting that the issue of mandatory connection to SGASA's

less intrusive means of connection existed that did not involve the use of electricity.  On that point, the Yoders had presented no evidence to suggest that a less intrusive alternative was available.  The court then cited a second factor belying any clear right to injunctive relief:  the Yoders had taken the position in Case No. 507 of 2014 that a preliminary injunction was necessary only until a decision was rendered in the related class action at Case No. 304 of 2013; however, the court in the latter case had ruled adversely to the class on January 27, 2016, and the Commonwealth Court had quashed the ensuing appeal.  *See* ECF No. 7-10 at 6-7; *Yoder v. Sugar Grove Area Sewer Auth.*, 2018 WL 297002, at *3.

The trial court also concluded that plaintiffs did not satisfy the sixth prerequisite for preliminary injunctive relief, which required a showing that granting the injunction would not adversely affect the public interest.  On this point, the court found that granting a preliminary injunction and enjoining the Yoders' electricity-based connection to the sewer system would actually harm the public interest relative to the health and safety concerns associated with safe disposal of sewage.  The court noted that SGASA designed its public sewer system to rectify the high malfunction rate of on-lot sewage systems.  Citing the quality of the surrounding soil and the substantial level of groundwater that allows for lateral movement of untreated sewage, the court found "there is a critical need for consistent and effective maintenance procedures to ensure that the malfunction rate is as low as possible."  ECF No. 7-10 at 8.  "[R]equiring [SGASA] to build a custom prototype grinder pump to engineer around the use of electricity is not conducive to the goal of stability in the sewer system," the court found.  *Id.*  And, the court reasoned, neither party could afford to pay for the creation of a custom prototype grinder pump

───────────────────

sewer system was resolved in the Authority's favor in prior proceedings, and the "only detail unresolved by the 2013 Order was the means of connection").

without harming the Authority's ability to conduct the operation and maintenance of the sewer system. *Id.*

In sum, the trial court found that the Yoders failed to meet their burden on three of the six preliminary injunction requirements and, for that reason, it denied their petition. The court further found that the manner of connection that would pose "the least possible intrusion on Plaintiffs' religious convictions and beliefs" was a conventional electrical grinder pump connection to the Yoders' privy.  ECF No. 7-10 at 9.  On further appeal to the Commonwealth Court, the trial court's ruling was affirmed.  *See Yoder v. Sugar Grove Area Sewer Auth.,* 2018 WL 297002.

### C.  The Current Litigation

The Yoders and the Trusts filed this lawsuit on October 15, 2021, seeking once again to enjoin SGASA's enforcement of the Ordinance.  In their five-count complaint, Plaintiffs assert that SGASA's attempts to enforce the Ordinance violate:  their right to religious liberty under the First and Fourteenth Amendments to the U.S. Constitution (Counts I and IV), their right to religious liberty under the Pennsylvania Constitution (Count II), their state statutory rights under the Commonwealth's Religious Freedom Protection Act (Count III), and their federal statutory rights under the Religious Land Use and Institutionalized Person Act of 2000 (Count V).  ECF No. 1.  In each of their claims, Plaintiffs request "[a] declaration and injunction ordering that [SGASA] may not insist and require that [they] connect to SGASA's sewer system or any other municipal system[.]" *Id*. ¶¶57(a), 63(a), 70(a), 79(a), and 87(a).

Plaintiffs aver in their complaint that SGASA does not have a compelling state interest in enforcement of the Sewer Connection Ordinance but, even if it does, SGASA has not chosen the least restrictive means of enforcing the Ordinance.  Compl. ¶¶ 20-21.  According to Plaintiffs,

they should be permitted "to utilize their own safe, effective and clean methods to remove sewage waters from their homes that comply with [their] sincerely held religious beliefs." *Id.* ¶22.  Plaintiffs contend that they should be permitted to utilize "a safe, secure outdoor privy (also referred to as an outhouse) for human waste (sometimes referred to as black water) and a safe, secure system for grey water disposal." *Id.* ¶23.

SGASA filed the pending motion to dismiss, along with a supporting brief, on December 23, 2021.  ECF Nos. 7, 8.  Therein, SGASA argues that:  (i) Plaintiffs' claims are barred or precluded by *res judicata* or *collateral estoppel*,  (ii) this Court lacks jurisdiction over Plaintiffs' claims by virtue of the *Rooker-Feldman* doctrine, (iii) the lawsuit should be dismissed or stayed based on abstention principles, (iv) Plaintiffs lack standing to assert claims based on the alleged violation of religious rights, and (v) Plaintiffs cannot state a claim as a matter of law.  *See id*.

Plaintiffs filed a response to SGASA's motion but have declined to file a responsive brief.  *See* ECF No. 11.  The issues are nevertheless sufficiently joined for purposes of adjudication.  To the extent the issues are not joined, that is owing to the Plaintiffs' decision to forego providing further legal argument in an opposing memorandum.

The Court's analysis follows.  Because the Court finds that Plaintiffs' claims are barred by the doctrines of claim preclusion and/or issue preclusion, it will dismiss this action on that basis without the need to address SGASA's remaining defenses.

## II.  DISCUSSION

*Res judicata* -- or "claim preclusion" -- "'refers to the effect of a prior judgment in foreclosing successive litigation of the very same claim, whether or not relitigation of the claim raises the same issues as the earlier suit.'" *Bream v. Pennsylvania State Univ*., No. 21-2823, 2022 WL 2816518, at *1 (3d Cir. July 19, 2022) (quoting *New Hampshire v. Maine*, 532 U.S.

11

742, 748 (2001)). *Collateral estoppel* -- or "issue preclusion" -- "prevents parties from litigating the same issue again when a 'court of competent jurisdiction has already adjudicated the issue on its merits.'" *Trustees of Gen. Assembly of Church of Lord Jesus Christ of Apostolic Faith, Inc. v. Patterson*, No. 21-1662, 2021 WL 6101254, at *4–5 (3d Cir. Dec. 21, 2021) (quoting *Witkowski v. Welch*, 173 F.3d 192, 198 (3d Cir. 1999)).

A federal court's application of claim preclusion or issue preclusion based on a prior state court judgment is grounded in the "federal full faith and credit" statute which provides that state judicial proceedings "shall have the same full faith and credit in every court within the United States ... as they have by law or usage in the courts of such State ... from which they are taken." 28 U.S.C. § 1738; *accord Marrese v. Amer. Academy of Orthopaedic Surgeons*, 470 U.S. 373, 380 (1985) (observing that "[t]he preclusive effect of a state court judgment in a subsequent federal lawsuit generally is determined by the full faith and credit statute," which "directs a federal court to refer to the preclusion law of the State in which judgment was rendered[ ]"). Consequently, in determining whether any judgments previously rendered against Plaintiffs in the state courts have preclusive effect in this action, we must consider how Pennsylvania courts would apply the doctrines of claim preclusion and issue preclusion in the context of this case. *See Turner v. Crawford Square Apartments III, L.P.,* 449 F.3d 542, 548 (3d Cir. 2006) (applying Pennsylvania law to determine the preclusive effect of a prior state court judgment) (*Lance v. Dennis*, 546 U.S. 459, 466 (2006)).

Under Pennsylvania law, claim preclusion bars a subsequent suit if it shares four factors with the prior suit: "an identity of issues, an identity of causes of action, identity of persons and parties to the action, and identity of the quality or capacity of the parties suing or being sued." *In re: Coatesville Area Sch. Dist.*, 244 A.3d 373, 379 (Pa. 2021); *see also J.S. v. Bethlehem Area*

*Sch. Dist.*, 794 A.2d 936, 939 (Pa. Commw. Ct. 2002).  The doctrine is intended "to shield

parties from the burden of re-litigating a claim with the same parties, or a party in privity with an

original litigant, and to protect the judiciary from the corresponding inefficiency and confusion

that re-litigation of a claim would breed." *Wilkes ex rel. Mason v. Phoenix Home Life Mut. Ins.*

*Co.*, 902 A.2d 366, 376 (Pa. 2006).  Consequently, it bars those claims in a later action that either

were raised, or could have been raised, in the previous adjudication. *Id.*  "The essential inquiry is

whether the ultimate and controlling issues have been decided in a prior proceeding in which the

parties had an opportunity to appear and assert their rights." *In re Jones & Laughlin Steel Corp.*,

477 A.2d 527, 531 (Pa. Super. Ct. 1984).  In making this evaluation Pennsylvania courts "look[ ]

to the basic issues and the harm sought to be remedied in the separate suits." *Id.*

  In this lawsuit, Plaintiffs seek "a declaration and injunction ordering that [SGASA] may

not insist and require that Plaintiffs connect to the SGASA sewer system or any other municipal

system." ECF No. 1, ¶¶57, 63, 70, 79, 87.  Plaintiffs' request is based on their assertion that

connection to the public sewer system violates their sincerely held religious beliefs.  *See id.* at

¶¶18-19, 30, 38.  To that end, Plaintiffs allege that enforcement of the Ordinance violates their

religious rights under the U.S. Constitution, the Pennsylvania Constitution, the Commonwealth's

Religious Freedom Protection Act ("RFPA"), 71 Pa. Stat. Ann. §§2401, *et seq,* and the Religious

Land Use and Institutionalized Person Act of 2000 ("RLUIPA"), 42 U.S.C. §§2000cc, *et seq*.

  Applying Pennsylvania preclusion principles to the case at bar, the Court readily finds

that Plaintiffs' claims in this case are barred by the *res judicata* doctrine.  As discussed, the

Yoders have litigated their underlying grievance, either as named parties or as absent class

members, in multiple prior proceedings in Pennsylvania state court, including: (i) SGASA's prior

lien action in Case No. A.D. 191 of 2012 (hereafter, the "2012 Action"), (ii) the class action filed

at Case No. 304 of 2013 (hereafter, the "2013 Class Action"), and (iii) Plaintiff's own preliminary injunction action in Case No. 507 of 2014 (hereafter, the "2014 Action"). Each of these prior cases involved the Plaintiffs' efforts to avoid connection to SGASA's sewer system on religious grounds. Thus, in each of the three prior actions, the Yoders' religious objections were raised and litigated, either as a defense or as an affirmative claim. *See* ECF No. 7-6 at 8-10 (court addressing, in the 2012 Action, the plaintiffs' position that "they should be precluded from connecting to the sewer lines" because "forcing them to connect would violate their Free Exercise rights under the First Amendment to the United States Constitution and Article I, Section 3 of the Pennsylvania Constitution."); ECF No. 7-12 at 1 (court noting plaintiffs' allegation in the 2013 Class Action that "their religious beliefs entitle them to an exemption from the mandatory connection to the local sewer system."); ECF No. 7-9 (court noting in the 2014 Action that plaintiffs filed a petition for a preliminary injunction without filing any underlying complaint and were attempting in their petition "to re-litigate the issue of the public interest in public health through sanitary disposal of waste versus private religious freedom addressed at 191 of 2012"). In fact, the plaintiffs in the 2013 Class Action asserted the very same claims that are asserted in this case, alleging that connection to SGASA's sewer system would result in violations of their religious freedom rights under the federal and state constitutions, the RLUIPA, and the RFPA. *See* ECF 7-12.[7] Thus, the "basic issues and the harm sought to be remedied" in this case are the same as in the prior state court proceedings. *In re Jones & Laughlin Steel Corp.*, 477 A.2d at 531. The Court also finds that the identities and capacities of the parties is identical because both the Yoders and SGASA were parties to the 2012 Action, the 2013 Class Action and

---

[7] As the Commonwealth Court later recounted, the trial judge ruled against the class on January 27, 2016, *see* ECF No. 7-12, the ensuing appeal to the Commonwealth Court was subsequently quashed, and the Pennsylvania Supreme Court ultimately denied the plaintiffs' petition for allowance of appeal. *See Yoder v. Sugar Grove Area Sewer Auth.*, 2018 WL 297002, at *2.

the 2014 Action.  In each of the previous state court proceedings, the Plaintiffs' religious-based claims were brought on behalf of the Yoders and/or on behalf of the Trusts, as is the case here.

Notably, Plaintiffs have not raised any substantial arguments to contradict SGASA's assertion of *res judicata*.  ECF No. 11 at 4, ¶¶ 46-59.  In their response to the pending motion, they posit that "[t]here is insufficient information to determine whether [they] were included as a party for the legal proceedings" in the 2013 Class Action, "as they are not properly identified." ECF No. 11 at 3, ¶¶ 18-45.  But this argument is specious.  Though Plaintiffs were not named as representatives in the 2013 Class Action, that litigation was brought by the lead plaintiffs on behalf of themselves and "All Others of the Old Order of Amish of Sugar Grove Township, Warren County, Pennsylvania."  ECF No. 7-12.  The Yoders are admittedly members of that group.  *See* ECF No. 1, ¶1 ("Plaintiffs are members of the Old Order Amish religion and owners of property in Sugar Grove, Warren County, Pennsylvania."); *id.* at ¶11 ("Plaintiffs are practicing, bona fide members of the Old Order Amish religion.").  This Court can take judicial notice of the fact that the 2013 Class Action was certified as a class action in an order dated April 25, 2014, as is reflected on the trial court's official docket.  There is no indication that Plaintiffs ever opted out of the 2013 Class Action litigation; on the contrary, the Commonwealth Court previously noted that Plaintiffs were members of the class.  *See Yoder v. Sugar Grove Area Sewer Auth.,* 2018 WL 297002, at 2 (observing that "the Old Order Amish, *including Owners*, brought a class action suit against the Authority challenging the constitutionality of the Mandatory Connection Ordinance (suit docketed at No. 304 of 2013)") (emphasis added).  And, in petitioning the court for preliminary injunctive relief in the 2014 Action, the Yoders apparently represented "that the preliminary injunction was only necessary until the decision in

15

the class action [was rendered]."  ECF No. 7-10 at 7.  The undersigned is therefore satisfied that the Yoders were absent class members in the 2013 Class Action.

"For a prior class action judgment to bar an action on the basis of *res judicata* the parties must be identical in both suits; the prior judgment must have been entered by a court of competent jurisdiction; there must have been a final judgment on the merits and the same cause of action must be presented in both cases."  *In re Jones & Laughlin Steel Corp.*, 477 A.2d at 531.  Here, all of the prerequisites for claim preclusion are present.  As absent members of the class in the 2013 Class Action, Plaintiffs were effectively parties to that litigation.[8]  The trial court had jurisdiction over the case and issued a final, adverse judgment on the merits, which the plaintiffs attempted unsuccessfully to appeal.  The plaintiffs in the 2013 Class Action asserted the exact same claims as are being asserted here.  *See* ECF No. 7-12.  Under the Pennsylvania Rules of Civil Procedure, "[a] judgment entered in an action certified as a class action shall be binding on all members of the class except as otherwise directed by the court."  Pa. R. Civ. P. 1715(c).  No such contrary direction has been given by the state court as far as this Court is aware.

In sum, "the ultimate and controlling issues" in this case "have been decided in [ ] prior proceeding[ ] in which the parties had an opportunity to appear and assert their rights."  *In re*

---

[8] As previous noted, the property where the Yoders reside is allegedly jointly owned by the Yoders as well as the Plaintiff Trusts. ECF No. 1, ¶¶ 2-6.  While the Yoders were members of the class in the 2013 Class Action, the same cannot necessarily be said of the Trusts.  But even if the Trusts were not technically "parties" to the 2013 Class Action, they are still bound by that judgment because they are in "privity" to the Yoders, who *were* parties to that action.  *See Day v. Volkswagerwerk Aktiengesellschaft,* 464 A.2d 1313, 1317 (Pa. Super. Ct. 1983) ("The doctrine of res judicata applies to and is binding, not only on actual parties to the litigation, but also to those who are in privity with them."); *see also Perelman v. Perelman*, 545 F. App'x 142, 149 (3d Cir. 2013) ("'Privity is broadly defined as mutual or successive relationships to the same right of property, or such an identification of interest of one person with another as to represent the same legal right.'" ) (quoting *Montella v. Berkheimer Assocs.*, 690 A.2d 802, 804 (Pa. Commw. Ct.1997)).

*Jones & Laughlin Steel Corp.*, 477 A.2d at 531.  Accordingly, claim preclusion bars the Plaintiffs' successive action here.

Even if that were not so, however, the Plaintiffs' claims in this case would fail on the basis of collateral estoppel or "issue preclusion." "'Under Pennsylvania law, the following conditions must be satisfied for collateral estoppel to bar a subsequent claim: (1) the issue decided in the prior case must be identical to the one presented in the later case; (2) there was a final judgment on the merits in the prior action; (3) the party against whom collateral estoppel is asserted was a party to the prior action, or is in privity with a party to the prior action; and (4) the party against whom collateral estoppel is asserted had a full and fair opportunity to litigate the issue in the prior action." *Kurtz v. Westfield Ins.*, No. 5:22-CV-1526, 2022 WL 2609140, at *3 (E.D. Pa. July 8, 2022) (quoting *Nationwide Mut. Fire Ins. Co. v. George V. Hamilton, Inc.*, 571 F.3d 299, 310 (3d Cir. 2009)). "Sometimes, Pennsylvania courts 'add a fifth element, namely, that resolution of the issue in the prior proceeding was essential to the judgment.'" *Id.* (quoting *In re Appeal of Coatesville Area Sch. Dist.*, 244 A.3d 373, 379 (Pa. 2021)).

Central to Plaintiffs' claims in this case are their allegations that:

- SGASA lacks any compelling state interest in requiring them to connect to its sewer system, ECF No. 1, ¶¶48, 61, 69, 76;

- Plaintiffs' chosen method for disposing of their waste-water does not, and will not, adversely affect others, *id.* at ¶49;

- the Ordinance provisions at issue are not facially neutral, *id.* at ¶53;

- mandatory connection to the sewer system is not narrowly tailored to avoid interference with Plaintiffs' exercise of their sincerely held religious beliefs, nor is it least restrictive and/or least obtrusive means of accomplishing any compelling state interest, *id.* at ¶¶ 53, 62, 69, 77;

- connection to SGASA's sewer system violates Plaintiffs' constitutional right to the free exercise of their religion as well as their rights under Pennsylvania's Religious Freedom Protection Act, *id.* at ¶¶ 51, 75, 68-69;

- the Ordinance constitutes a land use regulation within the meaning of the Religious Land Use and Institutionalized Person Act of 2000 ("RLUIPA"), 42 U.S.C. Section 2000cc et seq., *id*. at ¶81; and

- SGASA's enforcement of the Ordinance has resulted in a violation of Plaintiffs' rights under the RLUIPA, *id*. at ¶¶68, 85.

Yet all of these issues were decided adversely to Plaintiffs in the prior state court cases after the parties were given a full and fair opportunity to litigate their position. *See, e.g.,* ECF No. 7-12 at 15 ("There is a compelling state interest in ensuring health and safety of the community through the safe disposal of sewage.  If the disposal of sewage is improper, then it would risk the outbreak of disease."); *id*. at 16 (rejecting plaintiffs' argument that an acceptable means of ensuring safe disposal of sewage is for plaintiffs to use a privy for solid human waste, without regular safety inspections, and for plaintiffs to dispose of all other forms of waste by dumping it on the ground; court finding that "[t]o simply dump sewage on the ground is unacceptable"); *id*. at 17 (finding that the installation of new on-lot sewage systems was not an acceptable option because of evidence that such systems had a high malfunction rate); *id*. at 8 ("The Court finds that the challenged sewage ordinance at issue is neutral."); *id*. at 14-15 (finding that plaintiffs failed to produce clear and convincing evidence to establish that enforcement of the Ordinance substantially burdens their sincerely held religious beliefs); ECF No. 7-10 at 4 (finding that enforcement of the Ordinance would result in "moderate" harm to Plaintiffs' religious rights); ECF No. 7-12 at 15-18 (finding that the only tenable method for disposing of sewage safely was implementation of a grinder pump as originally planned by SGASA); ECF No. 7-10 at 4-5 (finding that there "was no acceptable alternate power source for the grinder pump and creating a new prototype was "untenable")); *id*. at 9 (finding that "the manner of connecting the property to the sewer system, which poses 'the least possible intrusion on Plaintiffs' religious convictions and beliefs' . . . is a conventional electrical grinder pump connection to the Plaintiffs' privy

located on the Plaintiffs' property."); ECF No. 7-12 at 8 ("Since there is no constitutional

protection afforded to Plaintiffs' claims, then Plaintiffs must rely exclusively on statutory

relief."); *id*. at 18 (finding that plaintiffs were not entitled to relief under the RFPA); *id*. at 10

(finding that the Ordinance "is not a land use regulation" and the "RLUIPA does not apply to the

Sugar Grove Township Sewage Ordinance"); *id*. at 8 ("Section 2000cc-1 [of RLUIPA] does not

apply because the Amish are not institutionalized persons."); *id*. at 9 ("The Sugar grove Sewage

Ordinance does not impose a substantial burden on a program or activity that receives federal

financial assistance. . . . Plaintiffs do not allege that they receive [federal] funding. Plaintiffs

failed to show that they met any of the requirements under 42 U.S.C. §2000cc(a)(2)(a)."); *id*. at

18 (finding, after trial, that Plaintiffs were not entitled to relief).

Plaintiff do not dispute that, in each of the three state court proceedings, the state court

issued a final judgment on the merits.  Moreover, the state court's determination of the

aforementioned issues was essential to each of the judgments rendered in the prior state court

proceedings.  Finally, and as previously discussed, the Plaintiffs in this action were also parties

to the prior state court proceedings, or are in privity to the Yoders, who were parties to all three

proceedings.  *See* n. 8, *supra*.

In summary, all of Plaintiffs' claims in the instant case are barred by the doctrine of claim

preclusion. In addition, the issues that are central to Plaintiffs' various claims have already been

decided in the prior state court proceedings.  In light of these conclusions, the Court need not

address SGASA's remaining arguments in favor of dismissal.[9]

---

[9] This includes SGASA's argument that the Court lacks jurisdiction over Plaintiffs' claims
pursuant to the Rooker-Feldman doctrine.  *See Oshri v. PNC Bank, Nat'l Ass'n*, No. 20-3248,
2022 WL 58544, at *2 (3d Cir. Jan. 6, 2022) (court determining that it "need not decide whether
[the trial court's dismissal of plaintiff's claim for lack of subject-matter jurisdiction based on the
*Rooker-Feldman* doctrine] was correct because [the] claim is barred by collateral estoppel, also

**IV. CONCLUSION**

Based upon the foregoing reasons, SGASA's motion to dismiss this case will be granted, and the Plaintiffs' claims will be dismissed with prejudice.

An appropriate Order follows.

_Susan Paradise Baxter_

Susan Paradise Baxter
United States District Judge

---

called issue preclusion") (*citing Hoffman v. Nordic Nats., Inc*., 837 F.3d 272, 277 (3d Cir. 2016) (holding that courts can apply claim preclusion before deciding their jurisdiction)).